**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI**

HARDESTY, et al.,               :     Case No. 1:16-cv-298
                              :
             Plaintiffs,        :     Judge Matthew W. McFarland
                              :
     v.                            :
                              :
THE KROGER CO., et al.,       :
                              :
             Defendants.      :

---

**ORDER DENYING IN PART AND GRANTING IN PART PARTIAL MOTION FOR
SUMMARY JUDGMENT (Doc. 76)**

---

This case is before the Court on Plaintiffs' partial motion for summary judgment (Doc. 76). Plaintiffs Joseph Hardesty, Madeline Hickey, Derek Chipman, and the 24 collective action members they represent (collectively, "Plaintiffs") seek summary judgment on two issues: (1) the liability of Defendants The Kroger Co., and Kroger G.O., LLC (jointly, "Kroger") under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* (FLSA), and the Ohio Minimum Fair Wage Standards Act, R.C. 4111.01 *et seq.* (OMFWSA); and (2) the failure of Kroger's "good faith" affirmative defense to the FLSA's imposition of liquidated damages.

**FACTS**

Plaintiffs work or worked as recruiters at Kroger's Center of Recruiting Excellence (CoRE). Kroger developed CoRE as a recruiting operation to hire new employees for its grocery stores. As recruiters, Plaintiffs reviewed candidate applications, made phone

calls to applicants (called "phone screens"), and scheduled applicants for in-store interviews. Each recruiter was a "part of a dedicated recruiting team providing [Kroger's] grocery retail stores with best-fit candidates for hourly store positions." (Doc. 50-6 at Page ID 1998.) CoRE's general manager, Buck Moffett, explained that the "best-fit criteria" included a candidate's availability, assessment results, ability to interact well with customers, and ability to meet the essential functions of the position they were interviewing for. (Doc. 46, Moffett Dep. at 52, Page ID 1769.)

Moffett made the decision to classify CoRE recruiters as exempt under the FLSA, meaning that they would not receive overtime pay for working more than 40 hours per week. (*Id.* at 31, 48-49, Page ID 1764, 1768.) He based that decision on the recruiters' ability to use their discretion to determine how to apply the best-fit criteria, to assess whether any given candidate would represent Kroger well, to evaluate candidates for other positions or other stores, to represent Kroger at recruiting events, and to recommend improvements to the recruiting process. (*Id.* at 63, Page ID 1772.) He discussed the matter with Kroger's human resources team. (*Id.* at 33, Page ID 1764.) But he did not consult any regulations or applicable law himself. (*Id.* at 46, Page ID 1768.)

Recruiters used different approaches when reviewing candidate applications. Some would call every new applicant. (Doc. 35, Hardesty Dep. at 85, Page ID 398.) Others would review the application a little more closely before calling, prioritizing applicants based on their availability or certifications. (Doc. 37, Hickey Dep, at 87, Page ID 514.) Still others would be even more selective, such that "it was often the case that [the recruiter] didn't need to contact all of the applicants who submitted applications and

2

met certain basic qualifications." (Doc. 62-6, Keenan Dec. ¶ 7, Page ID 3857.) For instance, Aiden Keenan "used the applicant's previous work experience, volunteer experience, assessment score, etc. to judge which applicants were the best, and I contacted them and not the others. I certainly didn't need anyone's input or approval to decide which qualified applicants to contact and which not to." (*Id.*) So the degree of review put into the applications before a phone screen varied from recruiter to recruiter.

Once they were on the phone with job candidates, the recruiters used a phone script to guide their discussions. (Doc. 40, Schiff Dep. at 126, Page ID 885.) The script changed periodically, based in part on feedback from recruiters who "felt we could enhance the questions further." (*Id.* at 128, Page ID 887.) It covered introductions, starting pay, and the candidate's interest in the position and availability. The recruiters were supposed to read the script word-for-word. But they were also expected to "own the experience," "say the script in a way that reflects [their] personality," and "sound conversational." (Doc. 50-15 at Page ID 2146.)

In addition to following the phone script, the recruiters had to ask three pre-written screening questions:

1. What is it about working at (Banner Name) that interests you the most?

2. As a (Position Title), what specific things would you do or say in order to provide friendly customer service to our customers?

3. Can you tell me about a work or academic related experience that you are most proud of?

(*Id.* at 2150.) The screening questions were "streamlined to make so they apply to all

3

applicants." (*Id.*)  Recruiters were instructed to "listen to the candidate as if [they] are a customer in the store."  (*Id.*)  The corporate paperwork they received also made it clear that "Recruiters make the decision" as to whether the candidate was a "quality fit for the position."  (*Id.*)  And, if the recruiter declined an applicant, there was a script for that, too.

Some recruiters stuck closely to the script with little to no deviation.  Kelly Rutledge, for her part, never asked probing questions beyond the three on the script.  She "had the understanding that [she] was to ask the three questions in the script."  (Doc. 41, Rutledge Dep. at 67, Page ID 1057.)  Amanda Gayhart complained that she was "simply asked to recite a script like a robot and if the person had a pulse, [she] was asked to move them forward to the interview process."  (Doc. 78-7, Page ID 4547.)

But for other recruiters, the script did not dictate every aspect of their interaction with the applicants.  For instance, Erica Brown "could and did tweak the way [she] conducted the interview."  (Doc. 62-5, Brown Dec. ¶ 5, Page ID 3852.)  She would adjust her questions "to better suit the candidate."  (*Id.*)  Another recruiter, Courtney Strosnider, followed the script closely when she first started out, but as she became more comfortable, she "moved away from the script and instead went with the flow of the conversation."  (Doc. 62-7, Strosnider Dec. ¶ 4, Page ID 3861.)  She stated that "[e]very interview was different, and Kroger gave me the discretion to conduct telephone interviews how I saw fit."  (*Id.*)  And, as recruiter Katelyn Davis pointed out, "[i]t was up to the recruiter to assess the [applicant's] answer; there was no answer key."  (Doc. 62-4, Davis Dec. ¶ 8, Page ID 3848.)  So she would ask "probing follow-up questions (that did not appear on any script) when [she] determined it would be necessary or helpful in

4

assessing a candidate." (*Id.*)

When deciding whether to schedule an interview with the store, recruiters varied as to what sort of candidate passed muster.  Some had low standards.  One recruiter felt that a candidate was a best-fit "[p]retty much if the candidate wouldn't cuss during the phone interview." (Doc. 61, Taske Dep. at 34, Page ID 3762.)  Another would simply ask the applicant's name and whether they could go to the store at a specific time.  If the answer was yes, "you set up the interview." (Doc. 45, Ward Dep. at 38, Page ID 1745.)

Other recruiters required more.  Corbin Hom looked for indicators of good customer service.  Enthusiasm and detailed "customer-oriented answers" went a long way for him; one-word answers, and other simple answers like being on time, did not. (Doc. 39, Hom Dep. at 24-25, Page ID 724.)  He made the decision of whether an answer was good enough for an in-store interview, without anyone else's review.  (*Id.* at 26, Page ID 725.)  Shawn Scott favored customer service too.  Since they were finding applicants for customer service positions, Scott "wanted to assess whether the person would be able to provide friendly customer service." (*Id.*)  Although Kroger provided the scripted questions, Scott testified that "it was completely up to me to assess the candidate's answers to my questions and whether the candidate did well enough to be scheduled for an in-store interview." (Doc. 62-5, Scott Dec. ¶ 6, Page ID 3839.)  And, for Eric Shrider, the phone screen was make-it-or-break-it for job candidates.  He "regularly decline[d] candidates whose applications (and assessment scores) were stronger than other candidates [he] passed along, based on the quality of the phone screen I had with them. [Shrider] sent people to the store with zeroes on their assessments, and [he] also declined

people with great assessments." (Doc. 62-3, Shrider Dec. ¶ 11, Page ID 3844-45.)

The record also contains evidence that some recruiters maintained contact with the stores. The stores gave them feedback on candidates the recruiters had sent. Davis testified that these communications helped recruiters "better understand a store's specific needs when necessary, and to calibrate and customize [the recruiters'] approach as needed." (Doc. 62-4, Davis Dec. ¶ 9, Page ID 3849.) "[T]he frequency and nature of these communications varied by division and by recruiter, but it was an important aspect of the job." (*Id.*)

## ANALYSIS

Summary judgment is appropriate if, after examining the record and drawing all inferences in a light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Lutz v. Huntington Bancshares, Inc.*, 815 F.3d 988, 992 (6th Cir. 2016). Plaintiffs seek summary judgment on two issues: (1) Kroger's liability under the FLSA and the OMFWSA and (2) the applicability of Kroger's "good faith" affirmative defense.

## I.    Kroger's liability under the FLSA and OMFWSA

The first issue pertains to Kroger's liability under the FLSA and the OMFWSA. The OMFWSA operates "in the manner and methods" of the FLSA. R.C. 4111.03(A). Since the Ohio law parallels the FLSA, courts routinely analyze both claims together under the FLSA framework. *Hurt v. Commerce Energy, Inc.*, 973 F.3d 509, No. 18-4058, 2020 WL 5105145, at *4 (6th Cir. Aug. 31, 2020). The Court will follow the Sixth Circuit's lead and focus on the federal claim.

Kroger's liability hinges on whether the recruiters fit into the FLSA's "administrative exemption." The FLSA requires employers to pay employees overtime, at a rate of at least one and one-half times their regular rate of pay, when they work more than forty hours per week. 29 U.S.C. § 207(a)(1). But if employees work in a "bona fide" administrative capacity, they are exempt from the FLSA's overtime requirements. 29 U.S.C. § 213(a)(1). The operative regulation defines an "employee employed in a bona fide administrative capacity" this way:

(1) The employee is compensated on a salary or fee basis at a raise of at least $455 per week;

(2) The employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and

(3) The employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."

29 C.F.R. § 541.200(a).

If all these elements apply, then the administrative exemption relieves employers of the obligation to pay their employees overtime. *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004). The employer bears the burden of proof to show, by a preponderance of the evidence, that the employees satisfy each element of the administrative exemption. *Id.*

This case shows that the employer bears that burden of proof even when it is the non-moving party. Usually it is the employer who moves for summary judgment on the

administrative exemption. But in cases involving cross motions for summary judgment, the Sixth Circuit has indicated that the burden of proving the administrative exemption by a preponderance of the evidence remains with the employer even when defending against summary judgment. *See, e.g., Lutz v. Huntington Bancshares, Inc.*, 815 F.3d 988, 992 (6th Cir. 2016); *Martin*, 381 F.3d at 578; *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 70 (6th Cir. 1997). Consequently, the employees are entitled to summary judgment unless the employer can present evidence creating a genuine issue of material fact as to whether the employees meet each of the three elements of the administrative exemption. *Martin*, 381 F.3d at 578. If the employer cannot satisfy that burden, then the employees are entitled to summary judgment. *Id.* And, though courts used to construe the exemption narrowly against the employer, the Supreme Court recently clarified that courts are to give FLSA exemptions a fair, rather than a narrow, interpretation. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018); *Sec'y of Labor v. Timberline S., LLC*, 925 F.3d 838, 850 (6th Cir. 2019).

Neither side disputes that the employees were paid at least $455 per week. But they disagree on elements two and three.

**A. The Recruiters' Primary Duty**

The first question pertains to the recruiters' primary duty. To fall within the administrative exemption, the recruiters' "primary duty" must be "directly related to the management or general business operations of the employer or the employer's customers" and include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). "Primary duty" means "the

principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Determining what an employee's duties are, and whether they are covered by the administrative exemption, are fact-intensive inquiries. *Perry*, 876 F.3d at 200. "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). A non-exhaustive list of factors to consider includes (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; and (3) the employee's relative freedom from direct supervision. *Id.*

Plaintiffs argue that their primary duties are the "mundane" tasks of reviewing applications to make sure they met the minimum qualifications, conducting phone screens, and scheduling applicants for in-store interviews. A CoRE Process Overview document identifies that the recruiters' three main duties are (1) reviewing candidates' applications, (2) phone screening candidates and scheduling interviews, and (3) forwarding candidates to store specific job requisitions. (Doc. 50-12 at Page ID 2034.)

Kroger views Plaintiffs' duties in broader terms. Kroger does not deny that the Plaintiffs' primary duties are the three tasks Plaintiffs identify, but in its view, the Plaintiffs' primary job duty is to identify and select best-fit candidates for in-store positions at Kroger's supermarkets. They accomplish this duty by performing several tasks, including the three tasks Plaintiffs identity—but with a more focused effort to find the best-fit candidates—as well as the following: directly communicating with hiring managers regarding candidates; developing novel approaches to solving various

9

recruiting-related problems; and improving upon various practices related to recruiting. (Doc. 81 at Page ID 4794.)

These two views of the recruiters' primary duty are reconcilable. Kroger does not deny that the recruiters' job is to assess applicants based on their applications and the phone screens and schedule the applicants (or not) for in-store interviews. Earlier in these proceedings, this Court has found that the record shows that "Plaintiffs have similar job descriptions and training, and that they spent most, if not all, of their time performing the same primary duties: (1) reviewing applications, (2) conducting phone screens, and (3) scheduling applicants for in-store interviews." *Hardesty v. Kroger Co.*, No. 1:16-CV-298, 2018 WL 4680801, at *6 (S.D. Ohio Sept. 28, 2018). Now at the summary judgment stage, the Court finds that the depositions and declarations establish that that three-step process constitutes the principal and most important purpose of the recruiters' employment at CoRE. *See* 29 C.F.R. § 541.700(a). The recruiters performed those tasks unsupervised. (*E.g.*, Doc. 39, Hom Dep. at 26, Page ID 725.) And, viewing both sides' evidence, the relative importance of those three tasks outweighed the importance of additional responsibilities some recruiters took on. *See* 29 C.F.R. § 541.700(a).

Kroger characterizes these three duties as carrying more significance than Plaintiffs would admit, and attempts to include other responsibilities on top of those. And it's true that the operative regulation provides that the major emphasis should be on the character of the employees' job as a whole. 29 C.F.R. § 541.700(a). But it also provides that the primary duty is the main or most important duty an employee performs. *Id.* Plaintiffs may indeed communicate with hiring managers, develop novel solutions to

recruiting problems, and improve recruiting practices. But the record shows that the relative importance of those duties, and the time they spend performing them, is not as significant as their three main obligations. So the Court finds that the three-part process of reviewing applications, making phone screens, and scheduling interviews constitutes the recruiters' primary duty for the purpose of determining whether the administrative exemption applies.

### B. Office or Non-Manual Work Directly Related to Management or General Business Operations

The next question is whether the recruiters' primary duty is "directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).

On this record, Plaintiffs cannot show as a matter of law that their primary duty did not directly relate to the general business operations of the employer or the employer's customers. The general business operations of Kroger and CoRE, fairly construed, require staff. The recruiters channeled job applicants to Kroger stores so that Kroger could staff its stores. A genuine question of material fact thus prevents this Court from finding that there is no direct relationship between the recruiters' primary duty and the general business operation of the employer. 29 C.F.R. § 541.200(a)(2).

11

Resisting this conclusion, Plaintiffs invoke the administrative-production dichotomy — under which a production employee does not qualify for the administrative exemption — and claim their work is more productive than administrative. In their view, their work is the production of slates of qualified applicants to local Kroger stores. This position does not persuade.

Under the administrative-production dichotomy, production employees generate the product or service the business offers to the public, and do not qualify for the administrative exemption. *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 644 (6th Cir. 2013). But not all work falls into one category or the other, so the dichotomy does not apply to every case. *Id.* And, when employees perform work that is "'ancillary to an employer's principal production activity,' those employees are administrative." *Renfro v. Indiana Michigan Power Co.*, 370 F.3d 512, 518 (6th Cir. 2004) (quoting *Martin v. Cooper Elec. Supp. Co.*, 940 F.2d 896, 904 (3d Cir. 1991).

Here, Plaintiffs concede that Kroger's primary production work is selling groceries. (Doc. 76 at 35, Page ID 4385.) Their work pertains to supplying Kroger's stores with job candidates who will perform the principal production activity of selling groceries. A genuine question of material fact thus arises as to whether the recruiters perform administrative, ancillary, or production work, precluding summary judgment in Plaintiff's favor.

## C. Exercise of Discretion and Independent Judgment on Matters of Significance

To be exempt under the administrative exemption, an employee's work must also include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). "The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e). Rather, exercising discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). An employee who exercises discretion and independent judgment "has authority to make an independent choice, free from immediate direction or supervision . . . even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c).

Plaintiffs advance several arguments in attempting to persuade the Court that they do not exercise discretion or independent judgment in their jobs. The Court will address them in turn.

### 1. The recruiters are not like the personnel clerks in 29 C.F.R. § 541.203(e)

Plaintiffs attempt to draw a parallel between themselves and the personnel clerks described in 29 C.F.R. § 541.203(e). That regulation discusses the differences between human resources managers (who generally meet the duties requirements for the administrative exemption) and personnel clerks (who generally do not). Personnel clerks who screen applicants to obtain information about their minimum qualifications—qualifications that exempt human resources managers usually set—typically reject any

13

applicants who do not meet minimum standards for a job opening. 29 C.F.R. § 541.203(e). Plaintiffs claim they are like the personnel clerks.

The Sixth Circuit has affirmed that determining whether the administrative exemption covers an employee's primary duties is a fact-intensive inquiry. *Perry v. Randstad General Partner (US) LLC*, 876 F.3d 191, 200 (6th Cir. 2017). As such, the Court must carefully analyze the facts of this case against the regulatory guidance and avoid drawing analogies the facts do not permit.

This Court cannot find that the recruiters here are like the non-exempt personnel clerks in 29 C.F.R. § 541.203(e). Whether a recruiter exercises discretion and independent judgment depends on whether they exercise selectivity in matching candidates with the requirements of a job opening, as opposed to referring several prospects who generally meet the minimum qualifications. *Andrade v. Aerotek, Inc.*, 700 F. Supp. 2d 738, 747 (D. Md. 2010) (quoting U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2005 WL 3308616 (Oct. 25, 2005)). The personnel clerks in § 541.203(e) do little more than cross-reference a candidate's profile with the company's minimum qualifications. So they do not provide an accurate analogy for recruiters that do more, like the recruiters here.

An example from another district court is more apt. In *Andrade*, another case involving recruiters, the court noted that the recruiter "did not screen solely for minimum qualifications, but often sent candidates to her Account Managers whose personalities made them a good fit, even when their qualifications were not as impressive as others." *Id.* at 747. The *Andrade* recruiter did not just screen applicants and send prospects to her client. She also, among other things, "determined whether they were a good fit based on

14

her knowledge of the clients' personality." *Id.* The Sixth Circuit picked up on *Andrade*'s reasoning in *Perry v. Randstad General Partner (US) LLC*, 876 F.3d 191, 200 (6th Cir. 2017). In *Perry*, the court found that "matching candidates to clients based on fit—meaning subjective criteria such as the match between a candidate's personality and a client's corporate culture—as opposed to objective criteria such as years of experience or test scores, involves meaningful discretion and independent judgment." *Id.* at 208.

Like the *Andrade* recruiter, the recruiters here made closer evaluations than simple qualification checks. Eric Shrider frequently declined candidates based on the phone conversation he had with them, even though they were stronger on paper than other candidates he selected for interviews. (Doc. 62-3, Shrider Dec. ¶ 11, Page ID 3844-45.) Shawn Scott testified that "it was completely up to me to assess the candidate's answers to my questions and whether the candidate did well enough to be scheduled for an in-store interview." (Doc. 62-5, Scott Dec. ¶ 6, Page ID 3839.) Aiden Keenan's approach was so selective that it was "often the case that [Keenan] didn't need to contact all of the applicants who . . . met certain basic qualifications." (Doc. 62-6, Keenan Dec. ¶ 7, Page ID 3857.) The corporate documents themselves instructed the recruiters that the deciding factor was not whether a candidate satisfied minimum requirements, but the recruiters themselves. (Doc. 50-15 at 6, Page ID 2150.)

Accordingly, based on the facts here, these recruiters were significantly different from the non-exempt personnel clerks described in 29 C.F.R. § 541.203(e). The record clearly shows that they matched candidates based on fit—specifically, a match between

the candidate's personality and the client's work culture. This application of subjective criteria "involves meaningful discretion and independent judgment." *Perry*, 876 at 208.

### 2. The Department of Labor opinion letters do not support Plaintiffs' position

In 1982, the Department of Labor stated that an employee who simply applies his or her knowledge in following prescribed procedures, or who determines whether specified standards are met, does not exercise discretion and independent judgment. U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 1982 DOLWH LEXIS 28, *3 (Oct. 4, 1982). *See also* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2005 WL 3308616 (Oct. 25, 2005). Plaintiffs argue that they simply apply their knowledge in following Kroger's prescribed procedures, determine whether minimum standards are met, and refer candidates to the real decisionmakers. So, in Plaintiff's view, they do not exercise discretion or independent judgment under the DOL's standard.

The record does not support Plaintiffs' portrait of their work. Although Kroger did expect the recruiters to strictly follow some policies, the recruiters did more than simply confirm minimum standards and schedule candidates for interviews without any input from their own judgment. The question is not whether there were strict procedures, but whether there was room for discretion and independent judgment within those procedures. "To determine whether an employee, constrained by guidelines and procedures, actually exercises any discretion or independent judgment," courts consider "whether those guidelines and procedures contemplate independent judgment calls or

allow for deviations." *Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 577 (6th Cir. 2007).

In *Renfro*, the employees argued that, because the employer had rigid procedures for how the employees were supposed to do their work, they were simply applying skills, not exercising discretion and independent judgment. The court rejected that position. The employees worked without constant supervision and the procedures permitted them to use their discretion and independent judgment. "Channeling discretion through a manual on procedure writing does not eliminate the existence of that discretion." *Id.* The employees had to follow the guideline, and the guideline laid out procedures—but it did not lay out "an encyclopedia of strict requirements" or "answer substantive questions" that might arise during their work. *Id.* And, record evidence showed "two different [employees] may solve the same problem two different ways, even though both solutions are equally effective." *Id.*

The recruiters in this case are like the technical writers in *Renfro*. They work without constant supervision. (*E.g.*, Doc. 39, Hom Dep. at 26, Page ID 725.) They vary in their methods to reviewing a candidate application before deciding whether to conduct a phone screen for a particular candidate. (Compare, e.g., Doc. 45, Ward Dep. at 38, Page ID 1745, with, e.g., Doc. 39, Hom Dep. at 24-25, Page ID 724.) In other words, they may compare and evaluate possible courses of conduct and make an independent choice without immediate direction or supervision. *See* 29 C.F.R. § 541.202(a – c). And, though Kroger has provided a script and certain words that the recruiters must use verbatim, Kroger also expected them to "own the experience" and "say the script in a way that

17

reflects [their] personality." (Doc. 50-15 at Page ID 2146.) So the phone screens clearly contemplated independent judgment. *Renfro*, 497 F.3d at 577.

It may be true that, since the recruiters were required to read the script verbatim, the script itself does not actually allow for deviations. But there was more to the phone screens than the script. Recruiters were instructed to "answer all candidate's questions first." (Doc. 50-15 at 4, Page ID 2148.) Some recruiters chose not to ask probing questions in response to things the job candidates said. But others did. (Doc. 62-4, Davis Dec. ¶ 8, Page ID 3848.) And this was clearly allowed. After asking the three scripted questions, recruiters were instructed that they "[could] ask for clarifying questions if more information is needed." (Doc. 50-15 at 6, Page ID 2150.) But most importantly, it was the recruiters' independent judgment that decided whether the candidate was a "quality fit for the position." (*Id.*) As corporate documents issued to recruiters made clear, "Recruiters make the decision" of whether a candidate is a quality fit. (*Id.*) Given Kroger's expectation that recruiters make the call of whether a candidate is deserving of an in-store interview, the prescribed procedures clearly contemplated independent judgment calls and allowed for discretion. *See Renfro*, 497 F.3d at 577.

### 3. The recruiters worked on matters of significance

The next question is whether the recruiters' judgment calls and discretionary decisions relate to "matters of significance." *See* 29 C.F.R. 541.700(a)(3). The term "matters of significance" refers to "the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). The work itself must be of substantial importance. In assessing the importance of the work, the Court looks to the work itself, not the

potential consequences if the employee fails to do the job properly. 29 C.F.R. § 541.202(f); *Lutz v. Huntington Bancshares, Inc.*, 815 F.3d 988, 997 (6th Cir. 2016).

The facts here show that the recruiters worked on matters of significance. Donald Moffett, general manager of CoRE, testified that part of the job required them to "make sure that we were scheduling enough interviews at the stores . . . to be able to hire enough folks to keep the stores staffed." (Doc. 46, Moffett Dep. at 60, Page ID 1771.) CoRE supported several aspects of the stores' needs, including the grocery retail divisions, new store openings, pharmacy operation, manufacturing, and the general office. (*Id.* at 24, Page ID 1762.) CoRE provided prospective staff for the store and the stores require staff to operate. So the recruiters worked on matters of significance.

\*    \*    \*

There are genuine issues of material fact with respect to two of the three elements of the administrative exemption. For that reason, the Court **DENIES** summary judgment on the issue of Kroger's liability under the FLSA and OMFWSA.

## II.    "Good faith" affirmative defense

Plaintiffs also argue that Kroger's good faith affirmative defense to the FLSA's imposition of liquidated damages fails as a matter of law. They claim that Kroger has not met its burden under 29 U.S.C. § 260 of establishing that it acted in good faith and with reasonable grounds to classify Plaintiffs as exempt.

"To prove that it acted in good faith, an employer 'must show that [it] took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions.'" *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 584–85 (6th Cir. 2004)

(quoting *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 909 (3d Cir. 1991)). "This burden on the employer is substantial and requires 'proof that [the employer's] failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict.'" *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002) (quoting *McClanahan v. Mathews*, 440 F.2d 320, 322 (6th Cir. 1971)). "Good faith" means more than merely not willfully misclassifying the employee. *Id.* "The employer has an affirmative duty to ascertain and meet the FLSA's requirements, and an employer who negligently misclassifies an employee as exempt is not acting in good faith." *Id.*

During Moffett's deposition, Plaintiffs' counsel asked Moffett a series of questions about what went into his decision to classify recruiters as exempt. This relevant exchange took place:

> Counsel:    Did you, yourself, consult any regulations or any applicable law regarding whether or not the recruiters at CoRE should be treated as exempt or non-exempt from the Fair Labor Standards Act or applicable state law when making the determination of whether or not they would be treated as exempt?
>
> Moffett:    No.

(Doc. 46, Moffett Dep. at 46, Page ID 1768.) Plaintiffs' counsel asked other questions pertaining to the same issue, but counsel for Kroger objected based on privilege. Later, as Plaintiffs point out, Kroger stipulated it would not rely on consultations with legal

counsel in support of its good faith defense under 29 U.S.C. § 260, through this response to an interrogatory: "Kroger affirmatively states that it is not relying on advice of counsel to support its good-faith defense and will not put on evidence concerning advice of counsel in this matter." (Doc. 78-6 at Page ID 4539.)

Plaintiffs argue that, on such a record, Kroger cannot show that it acted in good faith and with reasonable grounds for believing that its actions complied with the FLSA. In response, Kroger claims that Moffett made the decision to classify recruiters as exempt based on consultations with human resources and his understanding that recruiters would be using their discretion in finding best-fit candidates for Kroger positions.

Plaintiffs are correct. Although the Sixth Circuit has observed that "caselaw usually cites discussions with attorneys or government officials as evidence of good faith," *Sec'y of Labor v. Timberline S., LLC*, 925 F.3d 838, 857 (6th Cir. 2019), Kroger cites no authority showing that the circuit has extended that reasoning to consultations with human resources. Kroger is not relying on its consultations with legal counsel to support its good faith defense and Moffett admitted that he had not made any inquiries into what the FLSA required for workers to be classified as exempt. So—without more—his "understanding" that the recruiters would be exercising discretion was not an understanding informed by law. This is not enough for Kroger to prove its "substantial burden to prove both good faith and reasonable grounds for the incorrect classification," *id.*, if indeed a factfinder finds that Kroger's classification was incorrect.

Accordingly, since Kroger enters nothing in the record showing that it took the affirmative steps necessary to ascertain the FLSA's requirements, Plaintiff is entitled to

summary judgment on the failure of Kroger's good faith defense. *Martin*, 381 F.3d at 584.

## CONCLUSION

Based on the reasons above, the Court orders as follows:

(1) **DENIES** summary judgment with respect to Kroger's liability under the FLSA

and OMFWSA;

(2) **GRANTS** summary judgment in Plaintiff's favor with respect to the failure of

Kroger's good faith affirmative defense.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND